Dissenting Opinion by
MOON, C.J.,
in which LEVINSON, J., joins.
The plurality holds that Sierra Club lacks standing to challenge the failure of the Ha-wai'i Tourism Authority (HTA) to conduct an environmental assessment (EA), pursuant to chapter 343, otherwise known as the Hawai'i Environmental Policy Act (HEPA), prior to committing state funds to a contract for tourism marketing services. In my view, the court has misapplied the doctrine of standing by erroneously characterizing Sierra Club’s asserted injury as an injury to the environment. In actuality, the asserted injury in this case is the enhanced risk that Sierra Club’s plaintiff members will suffer environ *271 mental harm due to HTA’s failure to fulfill its alleged statutory responsibility to evaluate whether its marketing plan will have a “significant effect” on the environment. By insisting that Sierra Club demonstrate that the environment has been or will be harmed, the plurality raises the standing hurdle higher than even the showing necessary for success on the merits of Sierra Club’s claim, insofar as Sierra Club need show only that: (1) HTA was required to conduct an EA; (2) HTA failed to do so; and (3) as a result, Sierra Club’s plaintiff members—not the environment—have been or will be harmed. Because the plurality’s result is inconsistent with the language of chapter 343, federal precedent on this issue, and this court’s own precedent regarding standing in the context of environmental injury, I respectfully dissent and would hold that Sierra Club had standing to initiate this action.
I. DISCUSSION
This court has long acknowledged that “[s]tanding is that aspect of justiciability focusing on the party seeking a forum rather than on the issues he [or she] wants adjudicated.” Citizens for Protection of North Kohala Coastline v. County of Hawai’i [hereinafter, Citizens ], 91 Hawai'i 94, 100, 979 P.2d 1120, 1126 (1999) (quoting Life of the Land v. Land Use Commission of State of Hawaii, 63 Haw. 166, 172, 623 P.2d 431, 438 (1981)). To establish standing under both federal and Hawai'i case law, a plaintiff must show that: (1) it has suffered an “injury in fact” that is (a) concrete and particularized and (b) actual or imminent, rather than conjectural or hypothetical; (2) the injury is “fairly traceable” to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); see also Plurality Opinion (Plurality op.), at 250, 59 P.3d at 885 (quoting Mottl v. Miyahira, 95 Hawai'i 381, 389, 23 P.3d 716, 724 (2001)); Ka Pa‘ akai O Ka‘ aina v. Land Use Comm’n, 94 Hawai'i 31, 42, 7 P.3d 1068, 1079 (2000) (quoting Citizens, 91 Hawai'i at 100, 979 P.2d at 1126). Moreover, we have recently reiterated that, “where the interests at stake are in the realm of environmental concerns, ‘we have not been inclined to foreclose challenges to administrative determinations through restrictive applications of standing requirements.’ ” Citizens, 91 Hawai'i at 100-01, 979 P.2d at 1126-27 (quoting Mahuiki v. Planning Commission, 65 Haw. 506, 512, 654 P.2d 874, 878 (1982)) (brackets and some internal quotations omitted).
A. Injury in Fact Test
It is significant that, in this case, Sierra Club challenges HTA’s failure to conduct an EA pursuant to chapter 343.[1] An EA is “a written evaluation to determine whether an action may have a significant effect” on the environment. HRS § 343-2.[2] Chapter 343 *272 requires state agencies to prepare an EA prior to taking any action specified in HRS § 343-5(a). See HRS § 343(5)(a).[3] If a proposed action “may” have a significant effect on the quality of the environment, the agency is required to prepare an environmental impact statement (EIS). See HRS § 343-5(b).[4] If, on the other hand, the ágency initially determines that a proposed action will not have a significant effect on environmental quality, an EIS is not required. However, before finally determining that an EIS is not required, the agency must make the draft EA available for public review and comment for a period of thirty days. See id. Thereafter, the agency must respond in wilting to comments received during the public review period and prepare a final EA to determine whether an EIS is required. See id. Therefore, the provisions of chapter 343 are procedural, not substantive—i.e., under chapter 343, the agency must consider the potential environmental consequences of its actions and allow public participation in the review process, but chapter 343 neither compels the agency to undertake, nor bars the agency from undertaking, any particular substantive action. See Kahana Sunset Owners Ass’n v. County of Maui, 86 Hawai'i 66, 72, 947 P.2d 378, 384 (“The purpose of preparing an environmental assessment is to provide the agency and any concerned member of the public with the information necessary to evaluate the potential environmental effects of a proposed action.”); see also HRS § 343-1 (“It is the purpose of this chapter to establish a system of environmental review which will ensure that environmental concerns are given appropriate consideration in decision making along with economic and technical considerations.”). Accordingly, any alleged injury resulting from HTA’s purported failure to follow the provisions of chapter 343 is in the nature of a “procedural” injury. In other words, the alleged injury is that the agency acts without considering potentially “significant effects” of the environmental consequences of its actions, irrespective of whether there is actual environmental harm,[5]
Although this court has not specifically addressed standing requirements in the context of a “procedural” injury,[6] a number of *273 federal courts applying the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 et. seq (1994), the federal analogue to HEPA,[7] have done so.[8] It is clear from the federal case law that, although the “procedural” nature of an alleged injury cannot eliminate the requirement that an injury be concrete and particularized, the assertion of a procedural harm requires a court to focus more precisely on the exact nature of the alleged injury.
In Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the United States Supreme Court held that the plaintiffs did not have standing to seek judicial review of a rule promulgated by the Secretary of Interior that rendered section' 7 of the Endangered Species Act (ESA) applicable only to actions within the United States and on the high seas. Id. at 557-58, 578, 112 S.Ct. 2130. The basis for the Court’s determination was that the plaintiffs’ interest was speculative—ie., they did not demonstrate that the failure to extend the protections of the ESA to foreign countries would affect them because they had not established any concrete interest in the affected foreign places. See id. at 562-66, 112 S.Ct. 2130. Significantly, in the course of its analysis, the Supreme Court distinguished Lujan from cases in which the plaintiff had alleged a procedural harm. Specifically, the Court indicated that “[tjhere is this much truth to the assertion that ‘procedural rights’ are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.” Lujan, 504 U.S. at 572 n. 7, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Further, the Supreme Court surmised that, under its case law,
[plaintiffs] living adjacent to the site for proposed construction of a federally licensed dam [would have] standing to challenge the licensing agency’s failure to prepare an environmental impact statement, even though [the plaintiffs] could not establish with any certainty that the statement [would] cause the license to be withheld or altered, and even though the dam [would] not be completed for many years.

Id.

In light of Lujan, several federal courts have addressed standing requirements in the *274 context of a federal agency’s alleged failure to comply with the procedural provisions of NEPA. In Douglas County v. Babbitt, 48 F.3d 1495 (9th Cir.1995), cert. denied, 516 U.S. 1042, 116 S.Ct. 698, 133 L.Ed.2d 655 (1996), Douglas County sued the Secretary of the Department of the Interior for failing to comply with NEPA requirements that an EA and EIS be prepared before designating certain land as critical habitat for the Northern Spotted Owl pursuant to the Endangered Species Act of 1973, 16 U.S.C. § 1533(a)(3). See id. at 1498-99. The United States Court of Appeals for the Ninth Circuit interpreted Lujan to require a plaintiff to show “two essential elements” for procedural standing: that he or she (1) is a “person who has been accorded a procedural right to protect [his or her] concrete interests and [ (2) ] ... has some threatened concrete interest that is the ultimate basis of [his or her] standing.” Id. at 1500 (quoting Lujan, 504 U.S. at 572 n. 7, 112 S.Ct. 2130) (internal citations omitted). The court further noted that, in order to meet the “concrete interest” test, the plaintiff must also demonstrate a “geographic nexus” to the potential harm. See id at 1500 n. 5. The court determined that Douglas County had been “accorded a procedural right” under the provisions of NEPA and tfiat its proprietary interest in lands adjacent to the critical habitat represented the necessary “concrete interest.” Id. at 1501. The supporting affidavit in that ease alleged simply that the land management practices on federal land could affect adjacent county-owned land “[b]y failing to properly manage for insect and disease control and fire[.]” Id. Although it was uncertain whether the findings of an EIS would affect the Secretary’s critical habitat designation and when the adjacent county lands would actually be harmed, the Ninth Circuit held that the County had met all of Lujan’s “strict procedural standing requirements.” Id.
In addition to the above, the Ninth Circuit indicated that the plaintiffs must show that them interest falls within the “zone of interests” that the challenged statute is designed to protect. Douglas County, 48 F.3d at 1499. The “zone of interests” test is derived from the fact that NEPA does not contain a provision for a private right of action; rather, persons who seek to challenge federal agency actions in federal court for violations of NEPA must do so pursuant to the federal Administrative Procedure Act (APA), 5 U.S.C. § 551, et seq. (2000). See Douglas County, 48 F.3d at 1499 (citing Lujan v. National Wildlife Fed’n, 497 U.S. 871, 883, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)) [hereinafter, National Wildlife Fed’n]. Under the APA, “[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute” is entitled to judicial review. 5 U.S.C. § 702 (2000). In National Wildlife Fed’n, the United States Supreme Court held that, in order to have standing to challenge, inter alia, the Secretary of the Interior’s purported violations of NEPA in classifying certain publicly held lands, “the • plaintiff must establish that the injury he complains of (his aggrievement, or the adverse effect upon him) falls within the ‘zone of interests’ sought to be protected by the statutory provision whose violation forms the legal basis for his complaint.” National Wildlife Fed’n, 497 U.S. at 875-79, 883, 110 S.Ct. 3177 (emphasis in original). Applying this test, the Ninth Circuit in Douglas County concluded that Douglas County’s claimed injury fell within the protected environment interests contemplated by NEPA. See Douglas County, 48 F.3d at 1499-1501.
Similarly, in Committee to Save the Rio Hondo v. Lucero [hereinafter, Rio Honda ], 102 F.3d 445 (10th Cir.1996), the United States Court of Appeals for the Tenth Circuit held that an environmental organization had standing to challenge the Forest Service’s decision to allow summer use of a ski area in a national forest based on an alleged failure to comply with NEPA. Subsequent to discussing the significance of the procedural nature of a NEPA claim, the Tenth Circuit concluded that
the injury in fact prong of the standing test ... breaks down into two parts: (1) the litigant must show that in making its decision without following [NEPA’s] procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm; and (2) the litigant must show that the increased risk of envi *275 ronmental harm injures its concrete interests by demonstrating either its geographical nexus to, or actual use of the site of the agency action.
Id. at 449. Using the foregoing test, the court held that the plaintiffs in Rio Hondo had sufficiently established an injury in fact. Id. at 450.
With respect to the fust prong of the injury in fact test, the court held that the plaintiffs had established that they suffered an increased, threatened risk of environmental harm due to the Forest Service’s alleged uninformed decision making. Id. The plaintiffs had averred that the Rio Hondo river would be affected because the summertime use of the ski area would result in increased river water consumption, sewage discharge, non-point source pollution from increased vehicle travel, and silt and industrial pollution from the ski area’s mechanical operations. Id. Additionally, they had averred that the recreational and aesthetic value of the land in and around the ski area would be disturbed by increased development and mechanization. Id. The Tenth Circuit concluded that the foregoing averments were sufficient to establish that the plaintiffs had suffered a threatened increased risk of environmental harm due to the failure of the Forest Service to follow the procedures of NEPA. Id. (emphasis added).
With respect to the second prong of its injury in fact test, the Tenth Circuit held that the plaintiffs had a concrete interest because they had used the waters of the Rio Hondo watershed for their entire lifetimes for irrigation, fishing, and swimming, and they intended to continue them use. Id. Based on the foregoing analysis of the affidavits submitted by the plaintiffs, the Tenth Circuit held that the plaintiffs had demonstrated an injury in fact.[9]
Similar analyses of the procedural injury associated with the failure to follow the procedures of NEPA have been applied in other federal jurisdictions. See, e.g., Sierra Club v. Marita, 46 F.3d 606, 612 (holding that plaintiffs who used national forest had standing to challenge Forest Service’s alleged failure to comply with NEPA in developing forest land and resource management plan, even though the plan was not going to be implemented immediately, because the “concrete injury underlying the procedural default” is that “environmental consequences might be overlooked”), reh’g denied, 46 F.3d 606 (7th Cir.1995); Florida Audubon Soc’y v. Bentsen, 94 F.3d 658, 666 (D.C.Cir.1996) (defining the injury in fact test to challenge the failure to perform an EIS as one in which the plaintiff “must show that the omission or insufficiency of an EIS may cause the agency to overlook the creation of a demonstrable risk not 'previously measurable (or the demonstrable increase of an existing risk) of serious environmental impacts that imperil [plaintiffs] particularized interest”) (emphasis added); but see Sierra Club v. Robertson, 28 F.3d 753, 758 (holding that plaintiffs lacked standing to challenge the Forest Service’s alleged failure to comply with NEPA in developing a general land management resources plan because, without site-specific action to challenge, the “environmental injury” was too speculative), reh’g denied, 28 F.3d 753 (8th Cir.1994).
Although no single definitive test has arisen with respect to the analysis applicable to procedural standing, it is clear that under federal law the asserted injury in a NEPA case, which is analogous to the HEPA case before us, is that there is an increased risk that environmental consequences may be overlooked as a result of deficiencies in the government’s decision making process. Cf. Sierra Club v. Marsh, 872 F.2d 497, 500-01 (1st Cir.1989) (“[T]he harm consists of the added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment. NEPA’s object is to minimize that risk, the risk of uniformed choice, a risk that arises in part from the practical fact that bureaucratic decisionmakers (when the law permits) are less likely to tear down a nearly *276 completed project than a barely started project.”) (emphasis in original).[10] However, in order to assure that the plaintiff is a proper party, the plaintiff must still demonstrate a concrete interest in or geographical nexus to the proposed action.
With these principles as a starting point, I now consider their application to HEPA. In my view, the injury asserted by Sierra Club is clearly procedural. Sierra Club challenges HTA’s failure to conduct an EA prior to committing state funds to a contract for tourism marketing services. The purpose of the EA requirement, in the context of this case, is to require decision-makers to consider whether there may be a significant effect on environmental quality prior to the expenditure of money. See HRS §§ 343-2 and 343-5(a). The failure to follow the applicable procedures increases the risk that significant environmental effects will be overlooked by the relevant decision-makers. The injury— the increased risk of significant environmental effects due to uninformed decision making—is precisely the type of injury that chapter 343 was designed to prevent. Additionally, however, a particular plaintiff must be among the injured. Thus, a plaintiff must not only show that disregarding the procedural requirement will result in an increased risk of environmental harm, but also that the increased risk is to the plaintiffs concrete and particularized interests.
Although this court’s formulation of standing requirements has paralleled the development of standing requirements in federal law, see Akau v. Olohana, Corp., 65 Haw. 383, 389, 652 P.2d 1130, 1134-35 (1982) (citing Life of the Land, 63 Haw. at 176, 623 P.2d at 441), this court had also made it clear that its own standing requirements, particularly in the realm of environmental litigation, may be less stringent than the federal requirements. See Citizens, 91 Hawai'i at 100, 979 P.2d at 1126 (noting that standing principles are governed by “prudential” considerations and that standing requisites may be tempered, or even prescribed, by legislative and eonstitu-tional declarations of policy) (citing Life of the Land, 63 Haw. at 172, 623 P.2d at 438); see also Mottl, 95 Hawai'i at 389, 23 P.3d at 724.
With respect to the legislative and constitutional declarations of policy relevant to Sierra Club’s claim that the HTA failed to do an EA as required under HRS § 343—5(b), article XI, section 9 of the Hawaii Constitution states unambiguously that “[ejach person has the right to a clean and healthful environment” and that “[a]ny person may enforce this right against any party, public or private, through appropriate legal proceedings, subject to reasonable limitations and regulation as provided by law.” Haw. Const, art. XI, § 9 (1978). Moreover, the legislature has clearly declared the policy of this state with respect to the environmental review process in HRS § 343-1:
The legislature finds that the quality of humanity’s environment is critical to humanity’s well being, that humanity’s activities have broad and profound effects upon the interrelations of all components of the environment, and that an environmental review process mil integrate the review of environmental concerns with existing planning processes of the State and comities and alert decision makers to significant environmental effects which may result from the implementation of certain actions. The legislature further finds that the process of reviewing environmental effects is desirable because environmental consciousness is enhanced, cooperation and coordination are encouraged, and public participation during the review process benefits all parties involved and society as a whole.
It is the purpose of [chapter SIS] to establish a system of environmental review which will ensure that environmental concerns are given appropriate consideration in decision making along with economic and technical considerations.
*277 (Emphases added.) Furthermore, as noted earlier, HRS § 343-5(b) specifically requires that members of the public be permitted to review and comment on a state agency’s initial determination, in the course of developing an EA, that an EIS is not required. See supra note 4. Finally, HRS § 343-7(a) explicitly provides for judicial review of an agency’s failure to complete an EA:
Any judicial proceeding, the subject of which is the lack of assessment required under section 84.3-5, shall be initiated within one hundred twenty days of the agency’s decision to carry out or approve the action, or, if a proposed action is undertaken without a formal determination by the agency that a statement is or is not required, a judicial proceeding shall be instituted within one hundred twenty days after the proposed action is started. The council or office, any agency responsible for approval of the action, or the applicant shall be adjudged an aggrieved party for the purposes of bringing judicial action under this subsection. Others, by court action, may be adjudged aggrieved.
(Emphases added.)
In the context of HRS § 343-7(a), an “other” party who may be adjudged aggrieved is synonymous with a party who would have standing to challenge the failure to perform an EA because of a concrete and particularized injury fairly traceable to the defendant’s failure to perform the EA and capable of redress by the court. See generally Life of the Laud, Inc. v. Land Use Comm’n, 61 Haw. 3, 8, 594 P.2d 1079, 1082 (1979) (holding that plaintiff was an aggrieved party within the meaning of the Hawaii Administrative Procedures Act (HAPA) for the purpose of challenging the Commission’s reclassification of lands because plaintiff used lands in the immediate vicinity for, inter alia, aesthetic and recreational pursuits); East Diamond Head Ass’n v. Zoning Bd. of Appeals of City and County of Honolulu, 52 Haw. 518, 521-22, 479 P.2d 796, 797-98 (1971) (holding that plaintiff adjacent landowners were persons aggrieved within the meaning of HAPA for purposes of challenge to zoning variance, noting that “[tjhere must be special injury or damage to one’s personal or property rights as distinguished from the role of being only a champion of causes.”) (internal quotations omitted); Maile Sky Court Co., Ltd. v. City and County of Honolulu, 85 Hawai'i 36, 42, 936 P.2d 672, 678 (1997) (holding that lessee bound by contract to pay property taxes was an aggrieved party for the purposes of challenging tax assessment because, “[i]n the context of real property tax laws, a person is aggrieved when that individual’s pecuniary interests are or may be adversely affected”) (internal quotation marks omitted). The original legislative history of HEPA, discussing judicial review of EISs, contemplated that a plaintiff would be considered an “aggrieved party” with standing only if the party had exhausted available administrative review processes by participating in a contested case hearing, as specified in HAPA. See Stand. Comm. Rep. No. 956-74, in 1974 Senate Journal, at 1126-27. A contested case is an administrative proceeding “in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing.” HRS § 91-1(5). Inasmuch as the original legislative intent contemplated that one would have to exhaust administrative remedies through participation in a contested case hearing in order to be an aggrieved party, and agencies perform contested case hearings pursuant to some specific statutorily authorized function, it follows that, in authorizing judicial review, the legislature contemplated that an “aggrieved” party would be one whose interests fell within the “zone of interests” sought to be protected by the statute, which in this case would be the zone of interests sought to be protected by performance of an EA. In the instant case, the requirement of exhaustion of administrative remedies through participation in a “contested case hearing” is inapplicable because HTA did not hold such a hearing, nor would it be expected to do so. However, it is still logical to require that, in order to be an aggrieved party within the meaning of HRS § 343-7(a), the party’s alleged injury be one that HEPA was designed to protect. Cf. National Wildlife Fed’n, 497 U.S. at 879, 110 S.Ct. 3177.
Keeping in mind (1) the foregoing framework used by federal courts for analyzing NEPA claims and the knowledge that federal *278 courts have allowed similar challenges under NEPA, (2) the fact that this court may have less stringent standing requirements than do the federal courts, and (3) the foregoing constitutional and legislative policy declarations and considerations unique to Hawaii and HEPA, the plurality’s assertion that federal cases applying NEPA are inapposite to HEPA because federal law provides broader access to judicial review than HEPA, see plurality op. at 259-61 and 262-64, 59 P.3d at 894-96 and 897-99, is untenable. In its discussion of the federal law on this issue, the plurality wrongly conflates 5 U.S.C. § 702, the portion of the federal Administrative Procedure Act (APA) that allows persons aggrieved by agency action to seek judicial review of that action [hereinafter, Section 702],[11] with the broad “citizen suit” provision of the ESA and other environmental legislation. Consequently, the plurality erroneously concludes that the federal decisions applying NEPA rest on so-called “citizen suit” statutory provisions and then proceeds to compare these latter provisions with the procedural rights afforded by HEPA. See, e.g., plurality op. at 258, 258 n. 24, and 261, 59 P.3d at 893, 893 n. 24, and 896. In short, the plurality is comparing apples to oranges.
The plurality acknowledges that I have correctly outlined the procedural injury framework used by federal courts to determine whether a plaintiff has stated a cognizable injury pursuant to NEPA. See Plurality op. at 259, 59 P.3d at 894. As stated earlier, NEPA, like HEPA, requires a federal agency to first conduct an EA to determine if an EIS is needed and, if so, then to conduct an EIS. See supra note 7. However, NEPA contains no statutory provisions authorizing an individual to sue if an agency violates these requirements. Rather, a person seeking judicial review of a federal agency’s alleged failure to follow the provisions of NEPA must wait until the agency’s entire environmental review process is final before he or she can sue pursuant to Section 702, which uniformly applies to federal agencies in the absence of other more specific federal law. See National Wildlife Fed’n, 497 U.S. at 883, 110 S.Ct. 3177. The universe of potential plaintiffs able to challenge agency actions under Section 702 is limited by several factors dictated by the express language of Section 702 and the statutoiy framework of the APA in which it is embedded. First, the language unambiguously requires the plaintiff to have suffered a “legal wrong” or to have been “adversely affect or aggrieved[.]” Second, a person claiming the right to sue must identify some “agency action,” as defined by 5 U.S.C. § 551(13),[12] that affects him or her in a specified fashion. See National Wildlife Fed’n, 497 U.S. at 882, 110 S.Ct. 3177. Whether the complained of action constitutes “agency action” is itself subject to dispute. See, e.g., id. at 885-86, 890-91, 110 S.Ct. 3177 (land classification actions by Bureau of Land Management were “agency action” with respect to one plaintiff where a specific tract of land was involved, but were not “agency action” with respect to other plaintiffs where the other plaintiffs alleged that the Bureau was embarking upon a “program” of such actions in the absence of an agency order or regulation directing the classification actions in question or agency action with respect to specific lands). Third, pursuant to 5 U.S.C. § 704,[13] the agency action in question must be “final” agency action, see National Wildlife Fed’n, 497 U.S. at 882-83, 110 S.Ct. 3177, which is another legal determination subject to dispute. See, e.g., Bennett v. Spear, 520 U.S. 154, 177-78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (noting that, in order to be “final,” the agency action must *279 (1) “mark the ‘consummation’ of the agency’s decisionmaking process” rather than be of a “merely tentative or interlocutory nature” and (2) “be one by which Tights or obligations have been determined’ ” or from which “ ‘legal consequences will flow’ ”) (internal citations omitted). Fourth, the interest that the plaintiff seeks to vindicate must also be an interest that falls within the “zone of interests” sought to be protected by the specific statute allegedly violated by the agency. See National Wildlife Fed’n, 497 U.S. at 883, 110 S.Ct. 3177. Finally, the right of judicial review pursuant to the APA is further limited by other well-developed aspects of federal case law concerning administrative procedure such as ripeness, exhaustion of administrative remedies and defer-' ence to agency primary jurisdiction.
By contrast, as noted by the plurality, the “citizen suit” provision of the ESA at issue in Lujan, 16 U.S.C. § 1540(g), is not subject to the overlay of Section 702 and the other provisions of the APA. Rather, it directly confers a far broader, general right to sue for violations of the ESA:
(1) Except as provided in paragraph (2) of this subsection [dealing primarily with notice requirements] any person may commence a civil suit on his own behalf—
(A) to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof [.]
(Emphases added.) The statute does not expressly require that the plaintiff be “legally wronged,” “adversely affected,” or “aggrieved.” The statute does not contemplate first determining whether agency action has occurred, whether such action is final, or any of the other limitations coexistent with the APA and other principles applicable to judicial review of administrative decisionmaking. Moreover, the United States Supreme Court has held that the “zone of interests” under which the asserted injury must fall is far broader in the context of a suit brought under the citizen suit provision of the ESA than that of a suit brought under the APA. See Bennett, 520 U.S. at 162-66, 117 S.Ct. 1154. In fact, the citizen suit provision of the ESA is so broad that one of the critical issues in Lujan was whether Congress could even authorize such a broad right of action consistent with the cases and controversies requirement of Article III. See Lujan, 504 U.S. at 576-78, 112 S.Ct. 2130. As the plurality correctly points out, “[ejnvironmental statutes in the late 1960s and 1970s frequently included citizen suit provisions to' recognize the interest of the public in protection of the environment, and permit ‘private attorneys general’ to assist in implementation and enforcement.” Plurality op. at 258 n. 24, 59 P.3d at 893 n. 24 (citing Sheldon, Steel Company v. Citizens for a Better Environment: Citizens Can’t Get No Psychic Satisfaction, 12 Tul. Envtl. L.J. 1, 38 (1998)) [hereinafter, Sheldon]. Section 702, on the other hand, was originally enacted in 1946 as part of the APA, has remained substantially unchanged since then, see Pub.L. 79-404, § 10(a), 60 Stat. 237, 243 (1946), and is limited in scope by the aforementioned principles applicable to judicial review of administrative decisions. If Congress had wanted to insert a broad citizen suit provision in NEPA when it enacted the law in 1969—during the same period of time it was inserting other citizen suit provisions in environmental legislation—it would have done so; significantly, it chose not to.
In short, the “citizen suit” provisions of the ESA and other environmental legislation are not analogous to Section 702 because they confer a far broader right to sue than does Section 702.[14] Therefore, the plurality, in my view, erroneously characterizes NEPA, as invoked through Section 702, as a “citizen suit” statute conferring correspondingly broad access to the courts.[15] Having wrong *280 fully equated NEPA and the APA with broad-based “citizen suit” statutes, the plurality then attempts to derogate HEPA’s statutory authorization for judicial review by contrasting HEPA with these same “citizen suit” statutes rather than the more narrow provisions of NEPA upon which HEPA is based.
HRS § 343-7(a) authorizes members of the public who allege a cognizable harm due to the purported failure to complete an EA to seek judicial relief. The plurality correctly points out that HRS § 343-7(a) authorizes the environmental council, the office of environmental quality control, and the “applicant” for the spending project [hereinafter, collectively, named parties] to seek judicial relief from the purported failure to conduct an EA. See Plurality op. at 260-61, 59 P.3d at 895-96. As the plurality notes, the statute also authorizes “others” to sue if they are aggrieved. The plurality then claims that, in order to be aggrieved, a petitioner who is an “other” party “must satisfy substantive standing requirements.” I agree. Indeed, the very issue in this case is whether Sierra Club’s plaintiff members meet the substantive standing requirements necessary to qualify as “others.” However, the plurality implies that the language of HRS § 3^3-7(a) itself narrows that group of potential plaintiffs who would be “others”. See Plurality op. at 263, 59 P.3d at 898 (“The language of HRS § 343-7(a) expressing legislative intent to specifically describe the class of litigants who might challenge the lack of an EA is in plain contrast to the general language employed in NEPA and the APA.”). The plurality is once again incorrect.
HRS § 343-7(a) authorizes not only named parties, but “others” who are aggrieved, to seek judicial relief. There is no express limitation on who can qualify as an “other” party except that the purported “other” party must be aggrieved.[16] “[W]e must, in eon- *281 strumg a statute, give effect to the plain and obvious meaning of its language.” State v. Savitz, 97 Hawai'i 440, 446, 39 P.3d 567, 573 (2002) (Acoba, J., dissenting) (citing Fragiao v. State, 95 Hawai'i 9, 18, 18 P.3d 871, 880 (2001) (quoting State v. Kalama, 94 Hawai'i 60, 64, 8 P.3d 1224, 1228 (2000))) (internal quotation marks and brackets omitted). Consequently the language of HRS § 343-7(a) cannot be said to further restrict who can qualify as an “other” party. In this context, the meaning of the term “others” who may be “aggrieved” is analogous to a person “adversely affected or aggrieved” by agency action Section 702. Thus, the federal framework concerning standing in environmental procedural rights cases, such as the case at bar, is directly applicable to HRS § 343-7(a).[17] In light of the foregoing, the right of judicial review in HEPA is not narrower than that provided by NEPA, and the procedural rights framework of federal law is clearly applicable to HEPA. Cf. Molokai Homesteaders Co-op. Ass’n, 63 Haw. at 464, 629 P.2d at 1142 (describing the “genesis” of HEPA as being “diseernable” in NEPA and noting that HEPA “undoubtedly mirrors” NEPA’s basic concepts).
Consistent with the analogous federal law in this area, I would formulate the injury in fact test in this case as follows. First, Sierra Club must demonstrate that HTA failed to conduct an EA before undertaking its tourism marketing plan. Second, tracking the statutory purpose of an EA, Sierra Club must demonstrate that HTA’s failure to conduct the EA resulted in an increased risk that its marketing plan may have a “significant effect” on environmental quality, as defined in HRS § 343-2. Third, in order to ensure that the injury is concrete and particularized, Sierra Club must show that the increased risk of a significant effect on environmental quality injures its members personally by demonstrating a “geographic nexus” between individual members and the site of the injury. Finally, Sierra Club’s purported injury must be within the “zone of interests” sought to be protected by HEPA.[18] I, therefore, now address whether Sierra Club has sufficiently averred an injury in fact in this case.
1. Failure to Conduct an EA
Three plaintiff members of the Sierra Club present sufficient evidence to sustain a belief that HTA failed to conduct an EA. Margery *282 H. Freeman averred that she has relied upon environmental assessments in the past and that HTA did not complete one in regal'd to its marketing plan. Blake Oshiro averred that HTA did not complete an EA prior to implementing its marketing plan. David Kimo Frankel averred that he has reviewed and commented on EAs and EISs in the past to develop policy recommendations. He averred that he testified and submitted comments to HTA and received a number of public documents from HTA, including copies of the marketing plan, the request for proposals that HTA distributed, the minutes of the meeting at which HTA selected its vendor for the marketing plan, and a letter confirming HTA’s selection of its vendor. In none of these documents is there a reference to an EA. The unmistakable inference from Frankel’s efforts to obtain all relevant public documents is that he was attempting to obtain a copy of the EA, but that none existed. Moreover, in its written briefs to this court and at oral argument, HTA never claimed that it had performed an EA and has consistently maintained that it was not required to do so. Based on the foregoing, Sierra Club has met its present burden to establish that HTA did not conduct an EA.
2. Increased Risk That HTA’s Marketing Plan May Have a Significant Effect on the Environment
Although many of the Sierra Club members’ affidavits admittedly suggest a variety of generalized injuries and political grievances,[19] a closer look demonstrates that, in several instances, they have averred sufficient facts to suggest that HTA’s failure to conduct an EA has caused an increased risk of a “significant effect” on environmental quality.
Frankel avers that he regularly body surfs at Makapu'u Point and Sandy Beach and regularly uses the beaches across from Kapi'olani Park, all popular visitor destinations. He avers that more visitors at these locations will decrease his opportunity to “catch waves” and decrease the space available to enjoy the beach. He further avers that he lives in Volcano, Hawai'i, a small community with vacation rentals and narrow, rustic roads lacking sidewalks upon which he frequently walks for enjoyment. He states that he regularly sees visitors in rental vehicles during his walks and that an increase in rental vehicle traffic will lead to congestion and decreased enjoyment of his walks.
Freeman avers that she lives on Kaua'i and must travel the roadways in the Lydgate Park and Po‘ip;u areas in order to get to work and to conduct necessary shopping. She avers that these same roads are frequently traveled by visitors, and that she has experienced delays due to traffic congestion. She believes that more visitors will make this congestion worse. Similarly, Freeman avers that she regularly uses the beaches in these areas, that these same beaches are used by visitors, and that they are already often overcrowded such that she cannot swim without interference. She believes that additional visitors will decrease her enjoyment of the beach.
Oshiro avers that he lives in the Waikele area on O'ahu, a popular visitor shopping destination, and must use the roads in the vicinity to get to work. He also avers that he has experienced traffic delays and congestion and believes that an increased number of visitors will worsen this problem. Moreover, he maintains that he no longer visits Hanau-ma Bay, a popular beach and snorkeling destination, because of overcrowding attributable to visitors.
Finally, Robert Parsons avers that he resides on Maui and that his business requires frequent travel throughout the island. He states that he has experienced traffic congestion and delays, especially in the areas around resort destinations, that many of the vehicles he sees belong to visitors, and that there is no alternative route or public trans *283 portation system for him to use. He avers that increasing the number of visitors on the roadways will cause further delays and more dangerous commutes.
As noted earlier, see supra note 2, HRS § 343-2 defines a “significant effect” as
the sum of effects on the quality of the environment, including actions that irrevocably commit a natural resource, curtail the range of beneficial uses of the environment, are contrary to the State’s environmental policies or long-term environmental goals as established by law, or adversely affect the economic welfare, social welfare, or cultural practices of the community and State.
HRS § 343-6(a) directs that the environmental council[20] adopt administrative rules to, inter alia, “[prescribe the contents of an environmental assessment.” HRS § 343-6(a)(9). If there is any doubt as to whether Sierra Club’s averred injuries would fall within the ambit of the above definition of “significant effects,” we may look to the rules promulgated by the council. See In re Water Use Permit Applications, 94 Hawai'i 97, 144, 9 P.3d 409, 456 (“[W]here an administrative agency is charged with the responsibility of carrying out the mandate of a statute which contains words of broad and indefinite meaning, courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous.” (Internal quotation marks omitted.)), reconsideration denied, 94 Hawai'i 97, 9 P.3d 409 (2000). Hawai'i Administrative Rules (HAR) § 11-200-12(b) states:
(b) In determining whether an action may have a significant effect on the environment, the agency shall consider every phase of a proposed action, the expected consequences, both primary and secondary, and the cumulative as well as the short-term and long-term effects of the action. In most instances, an action shall be determined to have a significant effect on the environment if it:
[[Image here]]
(6) Involves substantial secondary impacts, such as population changes or effects on public facilities;
[[Image here]]
(11) Affects or is likely to suffer damage by being located in an environmentally sensitive area such as a flood plain, tsunami zone, beach, erosion-prone area, geologically hazardous land, estuary, fresh water, or coastal waters;....
(Emphases added.) The plaintiffs’ aver-ments clearly affect “environmentally sensitive areas” such as beaches, and involve “effects on public facilities,” including beaches and roads and their supporting infrastructures. It is not speculative that there is an increased risk that HTA’s marketing plan may have an effect upon these public facilities.
Moreover, both Hawai'i and federal case law recognize the aesthetic and recreational interests described above as cognizable injuries. In Citizens, 91 Hawai'i 94, 979 P.2d 1120 (1999), a case involving, inter alia, Ha-wai'i County’s failure to conduct an EA before approving a special management area permit for a development project, this court held that the plaintiff group members’ interests in picnicking, swimming, boating, and gathering plants and herbs on land near the proposed development project was sufficient to constitute injury in fact. See id. at 191, 979 P.2d at 1127. In Life of the Land, we held that the plaintiffs’ interest in “diving, swimming, hiking, camping, sightseeing, horseback riding, exploring and hunting” near a disputed development was a cognizable injury. See 61 Haw. at 8, 594 P.2d at 1082; see also Akau, 65 Haw. at 390, 652 P.2d at 1135 (holding that plaintiffs had standing to challenge action affecting their public right of way to the beach and characterizing the injury as a “recreational interest”); Robertson, 28 F.3d at 758 (“Complaints of environmental and aesthetic harms are sufficient to lay the basis for standing.”) *284 (citing Sierra Club v. Morton, 405 U.S. 727, 734, 92 S.Ct 1361, 31 L.Ed.2d 636 (1972)). Given the broad language and policy directives of HEPA, I believe that the legislature intended such interests to fall under the rubric of constituting a “significant effect” on the environment and to be a cognizable injury in court.
I agree with the plurality that, at the time HTA initiated its marketing plan by selecting Hawaii Visitors and Convention Bureau as its vendor, it was not certain that HTA’s tourism marketing plan would necessarily result in the above effects. Yet the plurality’s conclusion that the marketing plan might not cause an increased number of visitors coming to Hawaii does not defeat Sierra Club’s standing. The asserted injury is that there is an increased risk of significant environmental effects as a result of the failure of HTA to prepare an EA. That risk occurs when the uninformed decision is made, irrespective of whether the threatened harm will actually occur. Cf. Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1354-55 (9th Cir.1994) (holding that plaintiffs had standing in a NEPA case involving the proposed use of herbicides as part of a reforestation program, irrespective of speculation that the application of herbicides might not occur); Idaho Conservation League v. Mumma, 956 F.2d 1508, 1515 (9th Cir.1992) (holding that conservationists and environmental organizations had standing to sue the Forest Service for alleged violations of NEPA in adopting its land and resource management plan for the Idaho Panhandle Forest, notwithstanding the fact that any actual environmental consequences were “several degrees removed from the challenged action,” because the plan did not propose any site-specific development and that the threat of injury was “not one but numerous steps away”). It is not speculative that spending more money on tourism marketing will result in a greater chance that more visitors will use public facilities such as beaches, parks, and roadways already commonly used by visitors, thereby leading to more congestion and less enjoyment for those frequently using these same areas. Under the broad language of HEPA, the increased risk that these effects might occur is all the plaintiffs need show. The injury cannot be said to be hypothetical or conjectural as it is allegedly already occurring.
The fact that the plurality misapprehends the nature of a procedural injury such as this one is underscored bj' the fact that the plurality appears to give credence to HTA’s argument that the marketing plan’s focus is to increase the total expenditures of visitors by increasing per visitor expenditures, rather than increasing the number of visitors. See Plurality op. at 251, 59 P.3d at 886 (“the expressed goal ... was ‘an average growth rate of approximately 4.6% in visitor expenditures.’ ”) (emphasis in plurality opinion). However, consideration of the possible effects of a proposed action, rather than merely the intent of the action itself, is precisely the reason for conducting an EA. Regardless of the intent of the plan, it is reasonable to conclude that, when an agency created for the purpose of, inter alia, marketing tourism, see HRS § 201B-3(16) (Supp.2000),[21] spends a great deal of money to do so, there is a greater chance that more people will visit Hawaii. In fact, HTA’s marketing plan anticipates this obvious effect. Although HTA disingenuously claims that the ultimate goal of the plan is to increase total visitor expenditures rather than the total number of visitors, the plan contemplates attaining its goal by realizing an estimated 8,000,000 visitor arrivals by 2005. See Ke Kumu: Strategic Directions for Hawaii’s Visitor Industry, Appendix A at A-3 (appended to HTA’s motion for summary judgment by affidavit of Robert J. Fishman, Chief Executive Officer of HTA). This is in comparison to annual visitor arrivals of six to seven million persons for each year throughout the 1990s. See Hawaii Tourism Product Assessment: Vol. I-Executive Summary, Exhibit 2-A following page 2-2 (by affidavit of Robert J. Fishman). Thus, the HTA’s own studies and plans confirm the obvious: if HTA spends a lot more money marketing Hawaii, there is a reasonable chance more people will visit. I would not ignore this unmistakable conclusion.
*285 3. Geographic Nexus
The averments discussed above establish a geographic link between a purported harm and each plaintiff. Each increased risk pertains to an area regularly used by the respective plaintiff. As such, this prong of the injury in fact test is met.
4. “Zone of Interests”
Based on the above discussion, there is no question that Sierra Club asserts injuries that fall within the range of interests that an EA was designed to protect. Accordingly, this prong of the test is met as well.
II. CONCLUSION
By insisting that Sierra Club demonstrate that the environment has been or will be harmed, rather than demonstrating the existence of an increased risk of significant environmental effects on its plaintiff members’ concrete and particularized interests due to HTA’s failure to conduct an EA, the plurality raises the standing hurdle higher than even the showing necessary for success on the merits of Sierra Club’s claim. Such a result is inconsistent with the purpose of HEPA, inconsistent with analogous federal case law, and inconsistent with this court's own standing doctrine. Accordingly, I would hold that Sierra Club had standing to initiate this suit.[22]

. An organization may sue on behalf of its members even though it has not been injured itself when: (1) its members would otherwise have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization’s purpose; and (3) neither the claim asserted nor the relief itself requested requires the participation of individual members in the lawsuit. See Hunt v. Washington Apple Advertising Comm’n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); see also Aged Hawaiians v. Hawaiian Homes Comm’n, 78 Hawai'i 192, 204-05, 891 P.2d 279, 291-92 (Association had standing on behalf of its members to challenge land awards made by defendant because “it can reasonably be supposed that the [sought after] remedy, if granted, will inure to the benefit of those members of the association actually injured.” (Citing Hunt, 432 U.S. at 343, 97 S.Ct. 2434.) (Internal quotations omitted.)), cert. denied, 516 U.S. 819, 116 S.Ct. 77, 133 L.Ed.2d 36 (1995). In this case, both of the latter two requirements are clearly met and the first requirement is the only requirement at issue: whether the individual members of Sierra Club who have filed affidavits would have standing in their own right.

. HRS § 343-2 also states that:
“Significant effect” means the sum of effects on the quality of the environment, including actions that irrevocably commit a natural resource, curtail the range of beneficial uses of the environment, are contrary to the State's environmental policies or long-term environmental goals as established by law, or adversely affect the economic welfare, social welfare, *272 or cultural practices of the community and State.

. HRS § 343—5(a)(1) states in relevant part:
Except as otherwise provided, an environmental assessment shall be required for actions whichf ] ■ ■ • [pjropose the use of state or county lands or the use of state or county funds, other than funds to be used for feasibility or planning studies for possible future programs or projects which the agency has not approved, adopted, or funded, or funds to be used for the acquisition of unimproved real property!.]

. HRS § 343—5(b) states in relevant part:
Whenever an agency proposes an action in subsection (a), other than feasibility or planning studies for possible future programs or projects which the agency has not approved, adopted, or funded, or' other than the use of state or county funds for the acquisition of unimproved real property, which is not a specific type of action declared exempt under section 343-6, that agency shall prepare an environmental assessment for such action at the earliest practicable time to determine whether an environmental impact statement shall be required. For environmental assessments for which a finding of no significant impact is anticipated, a draft environmental assessment shall be made available for public review and comment for a period of thirty days. The office shall inform tire public of the availability of the draft environmental assessment for public review and comments pursuant to section 343-3. The agency shall respond in writing to comments received during the review and prepare a final environmental assessment to determine whether an environmental impact statement shall be required. A statement shall be required if the agency finds that the proposed action may have a significant effect on the environment.

. The plurality, noting that there is scant briefing on the topic of procedural standing and characterizing the dissent as having "seized upon” the topic, appears to suggest that somehow it is improper to do so. See Plurality op. at 257, 59 P.3d at 892. As the plurality understands, this court has' a duty to consider, sua sponte, whether the petitioner before it has standing. Akinaka v. Disciplinary Board, 91 Hawai'i 51, 55, 979 P.2d 1077, 1081 (1999). In the absence of standing, "we are without jurisdiction to consider” the case before us. State v. Moniz, 69 Haw. 370, 373, 742 P.2d 373, 376 (1987). Accordingly, although none of the parties ‘ in this case addressed the general issue of standing with any substantial depth, the significance of the standing issue is apparent and is illustrated by the depth in which the plurality itself addresses this topic.

. This court has previously confronted allegations involving the failure to complete an EA, but *273 has not had occasion to address this issue as a "procedural” injury, most likely because the plaintiffs' geographic proximity to the site of the injury was so close as to make the concrete injury obvious without further consideration. See Citizens, 91 Hawai'i at 101, 979 P.2d at 1127 (site of plaintiffs purported injury within "dozens of feet” of development project); Kahana Sunset Owners Ass’n, 86 Hawai'i at 68 & n. 1, 947 P.2d at 380 & n. 1 (challenge to proposed development located near plaintiffs); Pearl Ridge Estates Community Ass’n v. Lear Siegler, Inc., 65 Haw. 133, 136-37, 648 P.2d 702, 704 (1982) (Nakamu-ra, J., concurring) (challenge to Land Use Commission’s reclassification of land located near plaintiffs). In the latter two cases, we did not even address the issue of standing.

. Under federal law, regulations implementing NEPA require agencies to first conduct an "environmental assessment” to determine whether an environmental impact statement is needed, unless existing law or regulations have already determined the need for an environmental impact statement. See 40 C.F.R. §§ 1501.3, 1501.4, 1507.3, and 1508.9 (2000). An environmental impact statement is needed if an agency proposes legislation or contemplates "major Federal actions significantly affecting the quality of the human environment^]” See 42 U.S.C. § 4332(2)(C). Chapter 343, which provides for similar procedures for the development and publication of information on environmental decisions, and Chapter 344, which established a general policy on environmental protection, "undoubtedly mirror[] NEPA’s basic concepts.” Molokai Homesteaders Co-op. Ass’n v. Cobb, 63 Haw. 453, 464, 629 P.2d 1134, 1142 (1981); see also 1974 Senate Journal at 647-48 (Floor Speech of Senator Rohlfing describing Hawai'i legislation involving chapter 343 as one of NEPA’s state progeny).

. This court has looked to federal case law as persuasive authority for standing requisites. See, e.g., Life of the Land v. Land Use Commission, 63 Haw. 166, 173, 623 P.2d 431, 439 (1981) ("Although Supreme Court doctrine on this issue does not bind us, we have, on occasion, sought guidance therefrom.”); Reliable Collection Agency, Ltd. v. Cole, 59 Haw. 503, 510-11, 584 P.2d 107, 111 (1978) ("While we are not subject to the 'case or controversy’ requirement of Article III of the United States Constitution, the prudential considerations which have been suggested in the federal cases on standing persuade us that a party should not be permitted to assume the role and responsibility of a public official to enforce public law without a personal interest which will be measurably affected by the outcome of the case.”).

. The foregoing description of the harm associated with a violation of NEPA's environmental review provisions was made in the context of assessing whether the district court properly denied the plaintiffs' request for a preliminary ra-junction rather than in determining whether the plaintiffs had standing. See Sierra Club, 872 F.2d at 499. Nevertheless, the description is equally compelling in the context of the present case.

. As noted earlier, the relevant portion of Section 702 provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.”

. 5 U.S.C. § 551(13) defines “agency action” as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]”

.5 U.S.C. § 704 provides, in relevant part:
Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.

. Other citizen suit legislation similarly uses the "any person” language of the ESA. See, e.g., Toxic Substances Control Act, 15 U.S.C. § 2619 (1997); Surface Mining Control and Reclamation Act, 30 U.S.C. § 1270 (1997); Clean Water Act, 33 U.S.C. § 1365 (1988); Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a) (1997); Clean Air Act, 42 U.S.C. § 7604 (1997).

. The plurality’s error may stem from a misreading of comments by Professor Sheldon in the *280 aforementioned article which discusses recent Supreme Court jurisprudence that utilizes standing doctrine to limit access to federal courts under the "citizen suit" provisions of environmental legislation. See Sheldon, supra. Discussing the relatively liberal access permitted to federal courts in the 1960s and 1970s as a backdrop to the current situation, Professor Sheldon writes that:
Cases involving citizen suits and other statutory grants of standing were brought with equal ease. The [APA] includes an extremely broad grant of standing. Under [Section 702], "a person .. . adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.” The APA has allowed citizen standing in a wide variety of cases, especially under [NEPA].
Id. at 29 (footnotes omitted). Professor Sheldon's primary goal in this portion of her article was to describe the generally liberal access to federal courts that was permitted during the 1960s and 1970s, in contrast to the current situation. NEPA, via the APA, certainly was-and remains-one of the mechanisms by which plaintiffs obtained access to the courts. By virtue of the fact that it created an across-the-board environmental review process in the first place, NEPA undoubtedly significantly increased access to federal courts, relative to the situation that existed previously, to address many environmental issues'. Nonetheless, Professor Sheldon’s description of citizen suit and NEPA cases as being "brought with equal ease” appears to be a bit hyperbolic because the access authorized by the statutory provisions of NEPA and the APA is demonstrably not "equal” to the access authorized by the citizen suit provisions of ESA and other environmental statutes. If Professor Sheldon's article were a judicial opinion, I would term the language in this portion of her work "dictum.” Significantly, none of the cases cited by Professor Sheldon for the proposition that "[t]he APA has allowed citizen standing in a wide variety of cases, especially under [NEPA][,]” equates NEPA with “citizen suit” legislation. See id. at 29 n. 223 (citing Calvert Cliffs' Coordinating Comm. v. United States Atomic Energy Comm'n, 449 F.2d 1109 (D.C.Cir.1971); Aberdeen & Rockfish R.R. Co. v. Students Challenging Regulatory Agency Procedures, 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975); Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); National Wildlife Fed’n, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

. Moreover, HRS § 343-7 contains additional provisions for direct judicial review of the alleged failure to conduct other portions of the review process mandated by HEPA. While HRS § 343-7(a) provides for judicial review of the alleged failure to perform an EA, HRS § 343-7(b) provides for judicial review of the decision whether to perform an EIS, and HRS § 343-7(c) provides for judicial review of the decision to accept or reject an EIS. These statutes authorize judicial review at earlier stages of the environmental review process than NEPA and authorize review more frequently throughout the process *281 than NEPA. It would be incongruous to increase the range of environmental review procedures that are subject to judicial review and, at the same time, restrict the circle of potential persons for whom review is available. This is particularly true when the entire purpose of the review process at the stages upon which judicial review is authorized by HEPA is to expand public input. See, e.g., supra at 4 (describing the requirement that, when an agency conducts an EA and determines that an EIS is not required, it must make its draft EA available for public review and comment, respond in writing to the comment, and prepare a final EA).

. It is for this reason that I would adopt the additional “zone of interests” test to determine whether an "other” party has standing (or is aggrieved) pursuant to HRS § 343-7(a) when the "other” party is challenging government action for which there was no opportunity to participate in a contested case hearing. As with the analogous federal law, use of the "zone of interest” test under these circumstances limits, rather than expands (as the plurality wrongly concludes, see plurality op. at 259-60 n. 26, 59 P.3d at 894-95 n. 26), the potential universe of "other” parties. Under the "zone of interests” test, the concrete, cognizable injury asserted by a litigant who challenges the purported failure to complete an EA pursuant to HRS § 343-7(a) must also be an injury that was meant to be protected by the performance of an EA in the first place. Rather than being a "shotgun approach using scattered provisions” of the HEPA, see id., I submit that my approach is simply common sense.

. The party invoking jurisdiction bears the burden of establishing these elements. Each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. See Lujan, 504 U.S. at 561, 112 S.Ct. 2130. If this were the pleading stage, for example, general factual allegations of injury resulting from HTA’s conduct would suffice; for on a motion to dismiss we accept the allegations "as true and construe [them] in the light most favorable to the plaintiff.” Casumpang v. ILWU, Local 142, 94 Hawai'i 330, 337, 13 P.3d 1235, 1242 (citation omitted), reconsideration denied, 94 Hawai'i 403, 15 P.3d 815 (2000). At the summary judgment stage, however, Sierra Club can no longer rest on the mere pled allegations, but must demonstrate that it meets standing requirements by setting forth specific uncontroverted facts through affidavit or otherwise. See Hawai'i Rules of Civil Procedure Rule 56(e).

. For example, Robert Parsons avers that more visitors will affect the Slate’s water supply, sewage capacity, electric power generation, landfill capacity, fossil fuel consumption and pollution, and harbor and airport usage. Roberta Lynn Brashear avers that she does not want increased tourism to "negatively affect my health and well being.'’ Without more, these are generalized political grievances or "value preferences” not susceptible to a judicial forum. See Hawaii's Thousand Friends v. Anderson, 70 Haw. 276, 283-84, 768 P.2d 1293, 1299 (1989).

. The environmental council, consisting of up to fifteen members appointed by the governor, see HRS § 341—3(c), serves "as a liaison between the director [of the office of environmental quality control] and the general public[.]’’ HRS § 341-6. Among the functions of the council is to "monitor the progress of state, county, and federal agencies in achieving the State's environmental goals and policies[,]” including those in chapter 343. Id.

. HRS § 201B-3(16) gives HTA authority to "[d]evelop and implement the state tourism strategic marketing plan ... to promote and market the State as a desirable visitor destination!!]”

. Notwithstanding the fact that I would hold that Sierra Club has standing to assert its claims, the plurality's holding in this case renders any discussion as to the merits of those claims futile. Nevertheless, the plurality felt compelled to state:
[I]l is incongruous for the dissent to conclude that Sierra Club has standing but at the same time maintain that it need not say what its position would be as to the merits of the present case.
Plurality op. at 257, 59 P.3d at 892. As previously indicated, "say[ing] what [my] position would be as to the merits of the present case” would be futile insofar as any discussion of the merits would amount to nothing more than an advisory opinion by a minority of this court that has no precedential effect whatsoever. This is not a case in which the majority and minority disagree as to the disposition of the merits. The resolution of this case rests entirely on whether Sierra Club has standing. Having decided it does not, the plurality’s holding renders every other issue moot. Thus, despite the fact that the minority would hold otherwise with respect to the issue of standing, engaging in a protracted discussion of the merits would not only be fruitless, but ill-advised. In light of its holding, the plurality's statement that "[w]e would not find that argument [fi.e., that HTA is not an agency and, therefore, not under an obligation to produce an EA) ] meritorious,” id., is equally ill-advised.